**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **REVIVE RX, LLC,,** | § | |
| | § | **Civil Action No. _____** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **REED HOELSCHER,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Revive RX, LLC ("**Revive**" or "**Plaintiff**") respectfully files this Verified Original Complaint and Application for Preliminary and Permanent Injunctive Relief against Defendant Reed Hoelscher ("**Hoelscher**" or "**Defendant**"). The Complaint and Application are supported by the Declaration of Aaron Schneider, which is attached hereto as **Exhibit "A"**.

### SUMMARY

1.        This action is brought to halt a scheme of greed and deception by a former high-level, highly-compensated Revive employee. Defendant's malicious plot to unlawfully syphon business from Revive—and enrich himself—was uncovered by sheer happenstance during an operations review. But it will take more than luck to remedy Defendant's egregious misconduct. Absent relief from this Court, Hoelscher will walk away with massive ill-gotten gains, resulting from breaches of fundamental legal, contractual, and fiduciary duties owed to Revive.

2.        Revive is a leading mail-order pharmacy that provides generic and compounded medications to customers nationwide. Defendant's former position of trust, confidence, and access with Revive cannot be overstated. Hoelscher was employed as a Territory Sales Manager and,

thereafter, Director of Commercial Strategy and Business Development for Plaintiff ("**Sales Director**"). In this role, Hoelscher helped develop and execute Revive's business and marketing strategies. In addition, Hoelscher dealt directly with some of Revive's most valuable customers, vendors, and partners. In short, Defendant received and utilized Revive's confidential information and was given direct access to, and was assigned to grow, Plaintiff's most valuable vendor and customer relationships.

3.      Given his duties, responsibilities, and access to Revive's most sensitive information, Defendant executed an employment agreement as a condition of his Revive employment ("**Employment Agreement**"). The Employment Agreement contains reasonable and enforceable restrictive covenants designed to protect Revive's confidential information, business goodwill, and customer relationships. These covenants include basic confidentiality obligations, a non-compete, and a customer/employee non-solicit. The non-compete and non-solicit are limited in time to the period of Defendant's Revive employment and one-year thereafter (the "**Restricted Period**").

4.      Revive paid Defendant handsomely in exchange for both his services and agreement to these restrictions. Indeed, between 2023 and January 2025—when his employment terminated—Revive paid Hoelscher nearly a *million dollars* in salary and commission.

5.      Apparently, Plaintiff's trust and confidence was grossly misplaced. In January 2025, Plaintiff discovered that Defendant had been secretly operating and benefitting from a litany of competing side businesses *during* his Revive employment. More specifically, Defendant set up entities to market and sell the very pharmaceutical products offered by Revive. Defendant also created a back-door arrangement with competing pharmacies. Pursuant to this secret deal, Defendant funneled prescriptions through these entities *instead of Revive.* Defendant then received

commission payments from the competitors on products that could have—and should have—been furnished by Revive. Defendant's commissions on these products were deposited in the accounts of side businesses; Hoelscher Holdings, LLC ("**HHL**") and Stigg, LLC ("**Stigg**").

6.    Defendant's scheme was, apparently, a family affair. Defendant's father, Paul Hoelscher ("**Paul**"), served as Revive's CEO from October 3, 2023 until on or about January 30, 2025. On information and belief Defendant's secret and competing side businesses had Paul's blessing and inured to his benefit. For example, on information and belief, both Paul and Defendant profited from this rampant unfair, and illicit, competition and had access to the ill-gotten funds deposited in the HHL and Stigg accounts. In short, two of Plaintiff's most high-ranking and highly-paid employees were engaged in a conspiracy to enrich themselves by secretly competing with Revive.

7.    Defendant's conduct was unauthorized and unlawful, and constitutes a flagrant violation of basic contractual and legal duties owed to Revive. What's more, on information and belief, Defendant's unlawful course of conduct remains ongoing as he continues to operate competitively in violation of the Employment Agreement. A full accounting of the damage Defendant's cloak-and-dagger operation has caused is still underway—and can only be achieved through litigation discovery. What is already clear, however, is that Defendant's unlawful scheme netted him significant and unjust financial gain at Revive's expense.

## PARTIES

8.    Revive is a Texas limited liability company, with its principal place of business at 3831 Golf Dr. Houston, TX 77018. Revive is a compounding pharmacy business that services its customers nationwide.

9.     Defendant Hoelscher is an individual, natural person who Revive formerly employed as its Sales Director from February 2023 to on or about January 29, 2025. Defendant is a resident of the State of Texas and resides at 3944 Wentwood Drive, Dallas, TX  75225 and/or 26 W. Ninth Street, # 107, Dallas, Texas 75208.

## JURISDICTION AND VENUE

10.     Plaintiff Revive brings its federal claim under the Defend Trade Secrets Act of 2016 ("**DTSA**"). Revive owns the trade secrets at issue, which relate to a product or service used in, or intended for use in, interstate or foreign commerce. *See* 18 U.S.C. § 1836(b)(1).

11.     The Court has subject matter jurisdiction pursuant to the following statutes: (a) 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution and laws of the United States; and (b) 28 U.S.C. § 1367, which gives district courts supplemental jurisdiction over state law claims, including, without limitation: (i) Revive's claims against Defendant under the Texas Uniform Trade Secrets Act; for breach of contract (Breach of Non-Compete Covenant; Breach of Non-Solicitation Covenant; Breach of Exclusivity Obligation; Breach of Notification Requirement; and Breach of Confidentiality/Non-Disclosure Obligations); breach of fiduciary duty; unjust enrichment; and for civil conspiracy.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(a) through (c) because the parties reside or conduct business in this judicial district or the transactions-at-issue or the events or omissions giving rise to this lawsuit occurred in this judicial district. Pursuant to 28 U.S.C. § 1391(b)(1), Defendant resides in this judicial district and is a resident of Texas. Pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

13.     This Court has personal jurisdiction over Defendant because he is a citizen and resident of the State of Texas and contracted to perform pursuant to the Employment Agreement at issue under Texas law.

## FACTUAL ALLEGATIONS

### A.    The Nature of Revive's Operations.

14.     Founded in 2016, Revive's core mission is to redefine pharmaceutical care. Revive is a premiere 503A[1] compounding pharmacy that is dedicated to delivering customized medications tailored to patients' unique needs. Revive employs over 100 people, including board certified pharmacists, microbiologists, and chemists—each of whom bring a wealth of knowledge designed to ensure patients receive the highest quality compounded medications quickly, efficiently, and at reasonable prices. (Declaration of Aaron Schneider ("**Schneider Dec.**") at ¶¶ 2-4).

15.     Over the past several years, Revive has specialized in compounding weight loss medications such as semaglutide and tirzepatide—both of which have appeared on the FDA's drug shortage list and have been in significant demand. (*Id*. at ¶ 5). Currently, Revive ships patient medications to 45 of the 50 states—including Alaska and Hawaii. (*Id*.)

16.     Revive's business depends on referrals from a variety of sources, including clinics, physicians, and patients. To grow its business, Revive has invested heavily in vendor partnerships to help source high quality ingredients for its compounding pharmacy services at competitive prices. Revive is also engaged in a variety of marketing channels and strategies to build and enhance its brand of quality products and patient service throughout the country. The terms, scope, and nature of Revive's vendor partnerships and marketing strategies comprise some of the

---

[1] Of the Federal Food, Drug, and Cosmetic Act ("**FD&C Act**").

Company's highly-valuable confidential information. This confidential information allows Revive to succeed in an extremely competitive marketplace. (*Id*. at ¶ 6).

17.     In addition to the foregoing, Revive's confidential information includes its pricing and margins on various pharmaceutical ingredients and related products. (*Id*. at ¶ 7). For example, in compliance with the federal Food, Drug, and Cosmetic Act ("**FDCA**"), Revive sources raw pharmaceutical components from FDA-registered drug suppliers or other compounding wholesalers that specialize in providing high-quality active pharmaceutical ingredients ("**APIs**"). (*Id*.). What Revive pays these vendors for the products—*i.e.*, the raw API costs—is highly-confidential information that, if used or disclosed competitively, could significantly damage Revive's operations by allowing competitors to undercut Revive and effectively price it out of the market. (*Id*.).

18.     To help grow its business and win market share, Revive employs a team of sales people. Revive's sales team focuses on educating specialized medical practices that prescribe compounded medications on the high quality of Revive's products and services. These specialized medical practices include, without limitation: (i) hormone therapy clinics that frequently prescribe testosterone, estrogen, or progesterone; (ii) weight loss clinics for semaglutide or tirzepatide; (iii) functional medicine practices for customized supplements, or other customized medications; (iv) large institutional urology practices providing proprietary male fertility formulas, and hormone therapies; (v) urogynecology providing female care and fertility treatments; (vii) pharmacy central fill services servicing large specialty pharmacies with compounded medications and clinical support; (vii) clinical trials; and (viii) supporting human medicine (urology, urogynecology, endocrinology, fertility, ophthalmology, functional medicine, dermatology, pediatrics, weight loss, non-opioid pain management, male and female health).). (*Id*. at ¶ 9). Several of these clinics

provide virtual or "telehealth" wellness services—whereby patients can visit with a doctor from their phone, computer, or anywhere else with a camera and internet connection. (*Id*.).

19.    Along with educating physicians about Revive's high quality product and service offerings, the company's sales team ensures clinic personnel can navigate Revive's electronic system to ensure patient prescriptions are filled and delivered seamlessly. Revive prides itself on being able to fill and deliver patient prescriptions quickly and accurately. (*Id*. at ¶ 10).

**B.    Defendant's Revive Employment.**

20.    Defendant became employed with Revive on or about Feb. 20, 2023 and his title was Territory Sales Manager. (*Id*. at ¶ 11). On or about June 4, 2024, Defendant's title became Director of Commercial Strategy and Business Development ("**Sales Director**"). (*Id*.). Defendant remained in that role until his Revive employment ended on January 29, 2025. (*Id*.).

21.    As Sales Director, Defendant was an integral part of Revive's sales team. (*Id*. at ¶ 12). Defendant's primary job was to drive revenue through prescriptions filled. To do that, Defendant worked to educate physicians and clinics about the high-quality nature of Revive's operations, thereby increasing clinic/physician adoption and driving patient prescription volume. That, in turn, generated revenue for Revive. (*Id*.). More particularly, and without limitation, Hoelscher's Revive job duties included:

   a.  Implementing strategies to maximize Revive's growth potential in the industry;

   b.  Identifying emerging industry tends, competitors, and market segments;

   c.  Identifying profitable verticals in the industry;

   d.  Cultivating strategic partnerships to drive business development;

   e.  Growing and maintaining strong relationships with key revive clients, providers, and partners;

      f.   Analyzing key performance initiatives to evaluate the effectiveness of Revive's business strategies; and

      g.   Serving as the primary point of contact for major Revive accounts to ensure customer satisfaction.

(*Id*.).

22.     To perform his job duties for Revive, Defendant was provided—and had access to—Revive's highly confidential information. (*Id*. at ¶ 13). As noted above, this confidential information included, without limitation, data concerning Revive's vendor relationships, business partnerships, physician and clinic relationships, marketing strategies, pricing arrangements, API sourcing, and API margin information. (*Id*.).

23.     By way of his Revive employment, Defendant gained access to, and relied upon, Revive's vendor, partner, and physician relationships. (*Id*. at ¶ 13). Indeed, Defendant could not have performed his job duties for Revive without daily access to the customer and business goodwill Revive has spent substantial time and expense developing. (*Id*.).

24.     Revive paid Defendant handsomely throughout his employment. Defendant earned a base salary but his primary earnings came from commissions. Largely, Defendant earned commissions on revenue from prescriptions written by those clinics/physicians assigned to him—*i.e.*, those clinics and physicians that were considered his "accounts". In total, during Defendant's approximately two-years of Revive employment, he earned approximately $945,000. (*Id*. at ¶ 15).

**C.**   **Terms of Defendant's Revive Employment Agreement.**

25.    As a condition of his employment, Defendant signed an Employment Agreement with Revive. (Exhibit 1 to Schneider Dec.). The Employment Agreement set forth the terms and conditions of Defendant's Revive employment and, in addition, contains provisions designed to protect Revive's confidential information, goodwill, and other legitimate business interests. (*Id*.).

**a.**   **Non-disclosure obligation.**

26.    The Employment Agreement includes a non-disclosure obligation. Therein, Defendant agreed he would not "use or disclose" any of Revive's confidential information he obtained as a result of his employment. Defendant's obligation not to improperly use or disclose the Revive's confidential information is, unsurprisingly, not limited in time and exists so long as that information remains confidential.[2]

**b.**   **Exclusivity obligation.**

27.    Furthermore, the Employment Agreement requires that Hoelscher act exclusively for Revive's benefit. Specifically, Defendant is required to "devote [his] best efforts, business time, energy, ability, judgment, attention, knowledge, and skill to **faithful performance of Employee's duties and responsibilities and to the business of Revive RX**." Defendant was also required to

---

[2] Employment Agreement at § 7. (Exhibit "1" to Schneider Dec.).  The Employment Agreement defines "Confidential Information" as follows: "… information regarding past, current and prospective customers, past, current and prospective patients, investors, business affiliates, employees, contractors, strategies, methods, books, records, and documents, financial data, pricing strategies and price curves, positions, plans or strategies for expansion or acquisitions, capitalization plans and capital raising strategies and all information related thereto, budgets, evaluations, opinions and interpretations of information and data; contracts, personnel information, and notes, analysis, compilations, studies, summaries, and other material prepared by or for Revive RX or any of its affiliates containing or based, in whole or in part, on any information included in any of the foregoing."

act in "conformity with the policies, directions, and limitations as from time to time may be established by Revive RX."[3]

    **c.**    **Non-compete obligation.**

28.    In addition, the Employment Agreement contains a reasonable and enforceable non-compete.[4] In relevant part, the Employment Agreement's non-compete reads as follows:

> Employee agrees not to work or provide services, in any capacity, anywhere in the Restricted Area, whether as an employee, independent contractor or otherwise, with or without compensation, to any Person that is a competitor of Revive RX regarding all or any portion of the business of Revive RX. Competitor of Revive RX shall mean any Person that provides a product or service Revive RX provides or that has undergone substantial plans to provide such products or services as of the Effective Date of termination of Employee.

29.    In short, Defendant agreed—during his employment and for one year thereafter—not to perform services for a business that provides products or services of the same or similar nature of those provided by Revive. The non-compete's geographic scope includes anywhere that Defendant may have provided services for Revive. Given the nature of Revive's operations and Defendant's activities on Revive's behalf, this includes the entire United States.

30.    A large portion of Revive's business is conducted virtually, remotely, and via electronic means. (Schneider Dec. at ¶ 18). So too were Defendant's activities for Revive. (*Id*.) Indeed, Defendant regularly interacted with physicians, partners, vendors, and clinics around the country by phone, internet, and other similar means. (*Id*.) Accordingly, the Employment Agreement clarifies that Defendant cannot "avoid the purpose and intent" of the non-compete by "engaging in conduct within the Restricted Area from a remote location".[5]

---

[3] *Id*. at § 2. (emphasis added).

[4] *Id*. at § 8(a)i(a).

[5] *Id*. at § 9.

**d.    Customer non-solicitation obligation.**

31.    The Employment Agreement also contains a customer non-solicitation obligation. Specifically, during the Restricted Period Defendant agreed he would not:

> Solicit or encourage any client, customer, prospective customer, vendor, contractor, supplier or other business partner of the Company to terminate or diminish its relationship with the Company; or seek to persuade any such client, customer, vendor, supplier, or other business partner, or any prospective client, customer, vendor, supplier or other business partner of the Company to conduct business with anyone other than the Company with respect to any business or activity then conducted by the Company or that could reasonably be expected to be conducted by the Company[.][6]

32.    The Employment Agreement limits the above restraints to those persons or entities who "are or who have been a client, customer, vendor, supplier, or other business partner" of Revive within the preceding two (2) years.

33.    Defendant also agreed not to solicit or hire away Revive's employees. In particular, the Employment Agreement prohibits Defendant from hiring, engaging, or soliciting away any employee or contractor of Revive to discontinue or modify their employment relationship.[7]

**e.    Notice of conflicting activities obligation.**

34.    Finally, and importantly, Defendant was required to immediately notify Revive if he engaged in any action that could be deemed competitive to Revive or otherwise in conflict with the Company's business interests.[8] Specifically, Section 9 of the Employment Agreement requires that Defendant:

> [P]romptly notify Revive RX in writing upon Employee taking any action to invest in, own, manage, operate, control, participate in, be employed, or engaged by or be connected in any manner (directly or indirectly), including, without limitation, as an officer, director, employee, agent, or consultant,

---

[6] *Id.* at § 8(a)i(b).

[7] *Id.* at § 8(a)i(c).

[8] *Id.* at § 9.

SMRH:4926-2981-3040.3

with any Person engaging in a business the same as or similar to that of Revive RX (whether or not in the Restricted Area).

**D.    Defendant Engages In A Clandestine Scheme Of Self-Dealing And Unlawful Competition.**

35.    In or about January 2025, Revive discovered that Defendant was engaged in a shocking array of misconduct and self-dealing. (Schneider Dec. at ¶ 19). On information and belief, Defendant had secretly created—and been running—an interconnected web of competing business entities. These entities were operating in *direct competition* with Revive by diverting patient prescriptions and associated revenue elsewhere. The apparent purpose of these side businesses was simple: line Defendant's pockets with additional, 'off the books' commissions on competing pharmaceutical products and services.

36.    For example, on information and belief, Defendant is an owner/operator of an entity called Hoelscher Holdings, LLC ("**HHL**"), which was founded in August 2023. The below image is taken from a current "Corporate Wiki" search result for HHL:[9]



37.    On information and belief, HHL owns and/or operates multiple entities in the telemedicine and weight-loss space: (i) Trim Tribe RX, LLC ("**TTR**"); and (ii) GLP Nation, LLC

---

[9] https://www.corporationwiki.com/p/3g71tc/hoelscher-holdings-llc

("**GLPN**").[10] According to its website, TTR specializes in providing patients/customers with "effortless weight loss" by connecting them with an "expert medical team" to develop treatment plans and provide "medications delivered straight to your doorstep through our pharmacy partners." Below is a current screenshot from TTR's website:



38.    In short, TTR claims to connect patients seeking pharmaceutical weight loss products—such as semaglutide or tirzepatide—to medical doctors or clinics. Those doctors then conduct an assessment of the patient via a telehealth visit and, thereafter, write a prescription to be filled by any number of compounding pharmacies—*i.e.*, Revive competitors.

39.    On information and belief, Defendant's TTR entity is directly affiliated with—or managed by—a company called Morph Health and Wellness ("**Morph**").[11] Morph is a telehealth

---

[10] A "GLP-1" medication (glucagon-like peptide-1 agonist) are a class of medication that are frequently used to treat type 2 diabetes and obesity. Common examples of GLP-1 agonists include semaglutide and tirzepatide. A significant portion of Revive's business comes from compounding GLP-1 products in response to physician prescriptions.

[11] https://morphwellnessmd.com/

SMRH:4926-2981-3040.3

and wellness company that is owned and operated by Dr. David Lawrence.[12] Patients use Morph to arrange a virtual doctor's visit to get a prescription for pharmaceutical products—including compounded pharmaceuticals designed for "weight management, peptide therapy, testosterone therapy, female hormone therapy, sexual wellness, and hair restoration."[13] Defendant had a relationship with Morph through his Revive employment. (Schneider Dec. at ¶ 20). Specifically, Morph was one of Hoelscher's Revive accounts; meaning Defendant was charged with building a relationship with Morph for the sole purpose of driving prescriptions from Morph to Revive. (*Id.*) On information and belief, Defendant used his relationship with Morph to enrich himself at Revive's expense by driving prescriptions elsewhere.

40.     To summarize, Defendant—while employed by Revive—acted as an owner, operator, or agent of multiple telehealth/wellness companies that directed patients to care providers who wrote prescriptions filled by ***competing pharmacies***.

41.     Two such competitors are Striker Pharmacy ("**<u>Striker</u>**") and Casa Pharma RX ("**<u>Casa</u>**").[14] (Schneider Dec. at ¶ 22). Striker and Casa share common ownership and are licensed pharmacies specializing in sterile compounding. According to their websites, Striker and Casa's primary offering is compounded GLP-1 injectables—a core Revive product.

42.     Paul was first formally introduced to Striker's owner, Andrew Bejarano ("**<u>Bejarano</u>**"), on May 29, 2024, via an e-mail with the subject line, "Striker/Revive Introduction." The introduction was made to allow Paul and Bejarano to "discuss whether a mutually beneficial opportunity exists to enter into a joint venture."

---

[12] Dr. Lawrence appears to own or operate several other telehealth and wellness companies.

[13] www.morphwellnessmd.com/faqs

[14] www.strikerrx.com

43.    Following this introduction, Paul and Bejarano agreed via e-mail to meet in-person on June 13, 2024, to "discuss and finalize the peptide opportunities" and view the Striker pharmacy. Although GLP-1 products are not mentioned specifically between Paul and Bejarano in this e-mail chain, it is noteworthy that GLP-1 is a peptide hormone and a key Revive product offering.

44.    On the same introductory e-mail chain, Paul connected Bejarano with the person that would source their API and shared the list of pharmaceuticals they wanted to make—noting they "will sell whatever quantities [Striker] can dispense." Bejarano ended the e-mail chain on June 17, 2024, by saying he was looking forward to finalizing the partnership agreement.

45.    On information and belief, Defendant received substantial payments from Striker and/or Casa for prescriptions that could have, and should have, been filled by Revive. For example, Revive's investigation into Defendant's activities unearthed bank account and pay statements demonstrating that, over a course of months, Defendant received ***hundreds of thousands*** of dollars in commission payments for ***thousands*** of prescriptions filled through Striker and Casa. On information and belief, these prescriptions were written through TTR and/or Morph, who selected Striker or Casa as the filling pharmacy instead of Revive. Striker and/or Casa then paid Defendant commissions on the prescriptions.[15]

46.    On information and belief, Defendant fully committed to working for and with Striker and Casa ***during his Revive employment***. Defendant even went so far as to have individual e-mails set up for both Striker and Casa as BD@strikerrx.com and BD@casapharmarx.com.

---

[15] It is presently unclear whether Morph or its affiliates—including an entity called Royal Medical ("**Royal**") also paid Defendant.

47.     Recently uncovered e-mails between Defendant—using his Gmail account—and Striker personnel from August 2024 to December 2024 demonstrate Defendant's activities with and on behalf of Striker. For example, on August 13, 2024 Defendant sent an e-mail to Corina Guerrero ("**Guerrero**"), Striker's General Manager, and Bejarano. The subject line of Defendant's email was "Royal Medical Setup." Therein, Defendant inquired into Royal's integration and asked if his help was needed. Defendant similarly assisted with the setup and integration of other prescribers on Striker's behalf—such as Revell Health, Ironsail, and Titan Medical Center.

48.     On information and belief, Defendant was well compensated for this illicit work on Striker's behalf. Specifically, Defendant received commission payments for prescriptions filled by Striker—including prescriptions for GLP-1 products. In an August 22, 2024 e-mail from Defendant to Bejarano with the subject line "Wire for Commission," Defendant sent account and routing information for an account owned by HHL. Thereafter, Defendant asked "[w]hat will be the commission schedule?" A January 14, 2025 email from a Striker employee to Bejarano included attachments showing multiple payments over several months into Defendant's HHL and the Stigg bank accounts.

49.     In addition to performing services directly for Striker, on information and belief, Defendant also worked with Striker on behalf of Morph. Specifically, e-mails between Defendant and Striker reveal Defendant advising Striker to change Morph's pricing for certain pharmaceuticals and to send Defendant Morph's invoices, so he could "know what to pay."

50.     Notably in regards to Morph, on August 9, 2024, Defendant emailed a Striker employee that Morph's Striker invoice should include GLP orders. This further demonstrates Defendant directed prescriptions from Morph for GLP-1 products to be filled by Striker instead of Revive—despite GLP-1 injectables being a core Revive product.

51.     On information and belief, Defendant was actively tracking the GLP-1 prescriptions filled by Striker. For example, on August 14, 2024, Guerrero e-mailed Defendant the "RX Report" containing prescriptions from the first half of the month.  In response, Defendant requested all future reports include all prescriptions for GLPs. Defendant's inquiries into Striker's GLP-1 prescriptions demonstrate the scope and nature of his work on Strikers behalf.

52.     To be clear, while this occurred Defendant was a Revive employee and owed duties of loyalty, care, fidelity, and exclusivity to Revive. Defendant was also operating under the Employment Agreement that, among other things, prohibited Defendant from engaging in competitive activities. Apparently, Defendant's promises to Revive were worthless, although his misdeeds were profitable.

53.     On information and belief, Defendant's actions, notably his covert and competitive dealings with Striker from which he significantly profited, give rise to multiple civil causes of action *and* likely constitute a criminal violation of the Texas Commercial Bribery Act ("**TCBA**") (Tex. Penal Code § 32.43). Under the TCBA, a person who is a fiduciary commits an offense if (1) without the consent of his beneficiary, (2) he intentionally or knowingly solicits, accepts, or agrees to accept (3) any benefit from another person on agreement or understanding that the benefit will influence the conduct of the beneficiary in relation to the affairs of his beneficiary. Tex. Penal Code § 32.43(b). A person also violates the TCBA if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under the TCBA. Tex. Penal Code § 32.43(c).

54.     On information and belief, while Defendant was an employee and fiduciary of Revive—and without Revive's consent—Defendant solicited, accepted, and agreed to accept commission payments from Striker with the understanding those payments would influence Defendant to divert prescriptions that could have and should have been filled by Revive to Striker.

This includes Defendant's commission payments for GLP-1 prescriptions written by Morph and submitted to Striker, rather than to Revive.

55.    Although it is not presently defendant here, on information and belief, Striker also likely violated the TCBA by paying and agreeing to pay Defendant commissions to influence Defendant to divert prescriptions that could have and should have been filled by Revive to Striker.

56.    On information and belief, a significant portion of Defendant's misconduct and self-dealing appears to have been run through—or enhanced by—a company called RX Reinvented ("**RXR**").[16] RXR claims to provide marketing and other administrative services to physicians or specialty medical practices. Those medical practices see patients and write prescriptions for compounding pharmacy products. Accordingly, on information and belief, RXR has relationships with competing compounding pharmacies—such as Striker and Casa. On information and belief, RXR is either affiliated with or owned by Morph and its principal, Dr. Lawrence.

57.    E-mails between Striker and RXR's billing department further support RXR is either affiliated with or owned by Morph. On December 4, 2024, Guerrero sent an e-mail to RXR's billing department with the subject line "BILL TO MORPH CLINICS AT STRIKER." The e-mails between Guerrero and RXR's billing department primarily discussed an invoice and report representing the charges for prescriptions from November. In Guerrero's final e-mail, she requested the November prescriptions be included in the Commission Report and for the commissions on the prescriptions to be issued, the charges will have to be paid. Immediately following this e-mail, Defendant e-mailed Guerrero and Bejarano that it was "[p]robably best not to discuss commissions with clients."

---

[16] www.rxreinvented.com

58.    On information and belief, Defendant worked directly with RXR to funnel physicians and clinics to competing pharmacies in exchange for additional commission payments. This scheme, on information and belief, worked as follows: Defendant enrolled clinics and physicians with RXR using the promise of additional patient volume. RXR, in turn, marketed competing—*i.e.*, non-Revive—pharmacies to these physician/clinic clients for filling patient prescriptions. On information and belief, Defendant would earn commissions on prescriptions written by 'RXR physicians' and filled through 'RXR pharmacies'. As a result of Defendant's actions, on information and belief, thousands upon thousands of prescriptions that could have— and should have—been filled through Revive went elsewhere.

59.    Defendant apparently went to great lengths to divert business from Revive and through RXR. For example, in late 2024, a clinic attempted to partner with Revive to fill patient prescriptions. In response, that clinic was falsely told by a member of Revive's sales team that Revive was not currently accepting new physician/clinics. Weeks later, that same clinic was contacted by RXR to inquire about signing up with other, competing pharmacies. On information and belief, Defendant was the individual who communicated that falsehood in an effort to divert customer business.

60.    Apparently, Hoelscher rewarded Morph and Dr. Lawrence for their assistance with this scheme. On information and belief, Defendant secretly, unilaterally, and improperly gave Dr. Lawrence and Morph significant and unearned discounts on pricing for various Revive products, including compounded medications for hormone optimization (such as testosterone injectables) and weight loss products. On information and belief, Defendant provided these improper discounts to Morph and Dr. Lawrence to incentivize their assistance with Defendant's competitive activity—

which had proved highly lucrative for Hoelscher. As a result of this cut rate pricing, Revive was deprived of millions in revenue. (Schneider Dec. at ¶ 21).

**E.**    **Defendant Conspires With His Father, Revive's Former CEO.**

61.    As noted above, Defendant's father, Paul, served as Revive's CEO from October 3, 2023 until January 30, 2025. (*Id.* at ¶ 24). On information and belief, Paul and Defendant conspired to form and operate these competing entities and otherwise profit from the unlawful and competitive activities. Stating further, on information and belief Paul and Defendant each received commission payments from Striker and/or Casa on diverted prescriptions that could have, and should have, been filled through Revive. And, on information and belief, both Paul and Reed had access to the bank accounts for Stigg and HHL where at least some of the ill-gotten commissions were deposited.

**F.**    **Defendant Admits Wrongdoing While Concealing Key Facts.**

62.    After discovering just some of the above, Revive began an investigation. As part of that process, Revive undertook interviews with Defendant to ascertain the scope and nature of the competing activity. During those interviews, Defendant conceded that he had, in fact, formed the competing entity TTR. But Defendant claimed that neither he or any of his side entities had ever received any commission payments from competing pharmacies—such as Striker or Casa. As noted above, that statement was false. On information and belief, Defendant received significant commissions on *thousands* of prescriptions filled by competing pharmacies during his Revive employment. Prescriptions which Defendant expressly diverted away from Revive for the sole purpose of enriching himself to Revive's detriment.

63.    To be clear, Revive did not authorize Hoelscher to engage in competitive activities and certainly did not consent to Hoelscher sending prescriptions for products that could have and

should have been filled by Revive to Striker, Casa, or other competitors. Further, Revive did not authorize Hoelscher to earn wages or commissions performing services in competition with Revive. (Schneider Dec. at ¶ 23).

**G.    Defendant Attempts To "Resign" In The Midst Of Plaintiff's Investigation.**

64.    During the pendency of Revive's investigation into this misconduct, Defendant apparently saw the writing on the wall. On or about January 14, 2025, Defendant submitted his resignation from Revive—although his final day of Revive employment was January 29, 2025.

65.    On information and belief, Defendant is still engaged in the competing activities described above and herein, without restraint. Specifically, on information and belief, Defendant is providing services in competition with Revive by, among other things, causing prescription pharmacy products to be filled by Revive competitors and profiting therefrom.

66.    Apparently, Defendant believes he can simply pocket his unjust earnings and  walk away from his contractual, legal, and fiduciary obligations to Revive. This lawsuit is necessary to ensure that does not occur.

**H.    Defendant Continues To Profit From His Unlawful Activities.**

67.    On information and belief, Defendant's unlawful actions did not end with his Revive employment. Rather, on information and belief, Defendant continues to breach the Employment Agreement's restrictive covenants by, among other things, soliciting business for competing pharmaceutical entities—such as Striker and Casa—through the interconnected web of companies described above. These entities include, at minimum: (i) RXR; (ii) Morph; (iii) TTR; (iv) HHL; (v) Stigg; and (vi) GLPN.

68.    If left unabated, Defendant's breaching and unlawful activities continue to profit himself at Revive's expense.   Defendant's breaching activities place Revive's confidential

information and legitimate business interests with customers, vendors, and partners at significant risk.  Indeed, Defendant gained access to a trove of Revive confidential business information—including information regarding vendors, partners, and pricing—during  his Revive employment, as well as access to the very customer, vendor, and partner relationships that help make Revive successful. (Schneider Dec. at ¶¶ 13-14). Information which, on information and belief, Defendant is now using to unlawfully compete against Revive.

69.     These represent just some of the legitimate business interests the Employment Agreement's restrictive covenants are designed to protect. If not halted, Defendant's ongoing and flagrant violations of the Employment Agreement's restrictive covenants will irreparably harm Revive's business operations by jeopardizing, harming, or destroying the confidential information and customer/vendor/partner relationships Revive has worked tirelessly to develop and cultivate. (Schneider Dec. at ¶ 27). Further, if Defendant's unlawful activities are not immediately stopped, Revive will be wholly deprived of the restraints it bargained for, included in Defendant's Revive Employment Agreement, and paid Defendant handsomely in exchange for.  (*Id*.)

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract (Breach of Non-Competition Covenant)

70.     Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

71.     The Employment Agreement Defendant executed constitutes a valid, enforceable, and binding agreement under Texas law.

72.     Defendant received valuable consideration, including significant salary and commission, as well as access to Revive's confidential information, business goodwill, and

customer relationships as consideration for Defendant's promise to abide by the obligations under the Employment Agreement, including the non-competition covenant contained therein.

73.     Revive performed all of the duties and obligations to which it agreed and owed Defendant under the Employment Agreement.

74.     The Employment Agreement imposes non-compete obligations upon Defendant that are reasonable and necessary to protect Revive's legitimate business interests; impose no undue hardship on Defendant. Those restraints are not injurious to the public.

75.     The non-competition covenant contained in the Employment Agreement is reasonable and enforceable under Texas Business & Commerce Code § 15.50.

76.     The non-competition covenant is ancillary to or part of the Employment Agreement, which is otherwise an enforceable agreement at the time it was made.

77.     The national scale of Revive's operations, the directly competitive nature of Defendant's work, and Defendant's understanding and agreement to the terms and conditions of the Employment Agreement, reflect that the territorial limitation of his non-competition restrictive covenant is reasonable.

78.     The brevity of the twelve-month duration of the Employment Agreement's non-competition restrictive covenant further indicates that the restriction is reasonable.

79.     In the event the Court determines that the limitations as to time, geographical area, and scope of activity to be restrained in the Employment Agreement exceed those permitted by applicable law, any and all such terms shall automatically be adjusted to the maximum for such term permitted by such law. Tex. Bus. & Com. Code § 15.51(c).

80.     As detailed above, Defendant materially and intentionally breached—and is continuing to breach—the Employment Agreement by and through engaging in competitive

activities both during and after his Revive employment—i.e., during the Agreement's Restricted Period.

81.     As a direct and proximate result of Defendant's breach of the Employment Agreement, Defendant caused and will continue to cause Revive to suffer injury.

82.     Revive, therefore, is entitled to actual and compensatory damages, attorneys' fees, costs, injunctive relief, and such other further relief as the Court deems fair, just, and equitable.

83.     In addition, Revive is entitled to an injunction prohibiting Defendant's ongoing breaches of the Employment Agreement.

## COUNT II
### Breach of Contract (Breach of Non-Solicitation Covenant)

84.     Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

85.     The Employment Agreement Defendant executed constitutes a valid, enforceable, and binding agreement under Texas law.

86.     Defendant received valuable consideration, including significant salary and commission, as well as access to Revive's confidential information, business goodwill, and customer relationships as consideration for Defendant's promise to abide by the obligations under the Employment Agreement, including the customer non-solicitation covenant contained therein.

87.     Revive performed all of the duties and obligations to which it agreed and owed Defendant under the Employment Agreement.

88.     The Employment Agreement imposes customer non-solicitation obligations upon Defendant that are reasonable and necessary to protect Revive's legitimate business interests; impose no undue hardship on Defendant. Those restraints are not injurious to the public .

89.    Defendant received valuable consideration, including significant salary and commission, as well as access to Revive's confidential information, business goodwill, and customer relationships as consideration for Defendant's promise to abide by the obligations under the Employment Agreement, including the non-solicitation covenant contained therein.

90.    As detailed above, Defendant materially and intentionally breached—and is continuing to breach—the Employment Agreement's non-solicitation covenant.

91.    Upon information and belief, Defendant has solicited and continues to solicit Revive's customers, prospective customers, vendors, contractors, suppliers, or other business partners to do business elsewhere with competing entities. Indeed, Defendant received commission payments on compound pharmacy prescriptions filled by competing pharmacies during his Revive employment—directly evidencing the fact that Defendant was diverting Revive business elsewhere. On information and belief, Defendant continues to profit by soliciting customers, prospective customers, vendors, contractors, suppliers, or other business partners of Revive to do business elsewhere or otherwise to modify, reduce, or curtail their business with Revive.

92.    The Employment Agreement's non-solicitation covenant is reasonable and enforceable under Texas Business & Commerce Code § 15.50.

93.    The Employment Agreement's non-solicitation covenant is ancillary to or part of the Employment Agreement, which is an otherwise enforceable agreement at the time it was made.

94.    The national scale of Revive's business operations, the location(s) of its customers, vendors, and partners, and the directly competitive nature of Defendant's work reflect that the territorial limitation of the customer non-solicitation covenant is reasonable.

95.    The brevity of the twelve-month duration of the Employment Agreement's non-solicitation covenant further indicates that the restrictions are reasonable.

96.     In the event the Court determines that the restraints of the Employment Agreement's non-solicitation covenant exceed those permitted by applicable law, any and all such terms shall automatically be adjusted to the maximum for such term permitted by such law. Tex. Bus. & Com. Code § 15.51(c)

97.     As a direct and proximate result of Defendant's breach of the customer non-solicitation covenant, Revive has suffered injury.

98.     Revive, therefore, is entitled to actual and compensatory damages, reasonable attorneys' fees, costs, and such other further relief as the Court deems fair, just, and equitable.

99.     In addition, Revive is entitled to an injunction prohibiting Defendant's ongoing breaches of the Employment Agreement.

## COUNT III
## Breach of Contract (Breach of Exclusivity Obligation)

100.    Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

101.    Pursuant to Section 2 of the Employment Agreement, Defendant was required to "devote [his] best efforts, business time, energy, ability, judgment, attention, knowledge, and skill to [the] faithful performance" of his Revive job duties.

102.    As described in detail above, Defendant materially breached this contractual obligation by, among other things, engaging in a variety of competing activities for his own personal gain. Such activities included, without limitation, forming and operating competing businesses and diverting prescriptions, business and revenue away from Revive to competing pharmacies—for which Defendant received payment.

103.    As a direct and proximate result of Defendant's breaches, Defendant caused Revive to be injured.

104.    Revive, therefore, is entitled to actual and compensatory damages, attorneys' fees, costs, and such other further relief as the Court deems fair, just, and equitable.

**COUNT IV**
**Breach of Contract (Breach of Notification Requirement)**

105.    Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

106.    Pursuant to Section 9 of the Employment Agreement, Defendant was required, during his Revive employment, to  immediately notify Revive if he engaged in any action that could be deemed competitive to Revive or otherwise in conflict with the Company's business interests.   Specifically, Section 9 of the Employment Agreement requires that Defendant "promptly notify Revive RX in writing upon Employee **taking any action to invest in, own, manage, operate, control, participate in, be employed, or engaged by or be connected in any manner** (directly or indirectly), including, without limitation, as an officer, director, employee, agent, or consultant, **with any Person engaging in a business the same as or similar to that of Revive RX** (whether or not in the Restricted Area)."

107.    Defendant breached this contractual obligation by, among other things: (i) forming, investing, and/or owning TTR, HHL, Stigg, EMRG LABS LLC, PAYBLUUM LLC, Total Wellness Advisory Group  LLC, RXR, and GLPN and performing work on behalf of those entities of a nature similar to and/or in competition with Revive; (ii) engaging with Morph for purposes of performing business of a similar nature to Revive and offering similar services to that of Revive; (iii) generally becoming engaged by or connected to other persons or entities engaging in business the same as or similar to that of Revive. As described in more detail above, Defendant performed services for or on behalf of both himself and other individuals and entities for the purpose of causing compound pharamcy prescriptions to be filled by competing entities and Defendant was

compensated as a result. Defendant failed and refused to notify Revive of these competing activities Defendant undertook during his Revive employment and therefore breached Section 9 of the Employment Agreement.

108.    As a direct and proximate result of Defendant's breaches, Defendant caused Revive to be injured.

109.    Revive, therefore, is entitled to actual and compensatory damages, attorneys' fees, costs, and such other further relief as the Court deems fair, just, and equitable.

**COUNT V**
**Breach of Contract (Confidentiality/Non-Disclosure Obligations)**

110.    Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

111.    Pursuant to Section 7 of the Employment Agreement, Defendant agreed not to use or disclose to any person, except strictly in furtherance of the performance of his duties for Revive, any of Revive's "Confidential Information."

112.    The Employment Agreement defines Confidential Information to mean the company's confidential information and trade secrets and includes, without limitation, "information regarding past, current and prospective customers…business affiliates, employees, contractors, strategies…financial data [and] pricing strategies".

113.    As described more fully above, Defendant was provided access to Revive's Confidential Information as part of his Revive employment.

114.    As described more fully above, Defendant breached the Employment Agreement's confidentiality obligations by using and/or disclosing Revive's Confidential Information in furtherance of engaging in competitive activities that also violated Defendant's other legal and contractual obligations to Revive. For example, on information and belief Defendant used and/or

disclosed confidential customer, vendor, and pricing information in order to divert prescriptions to competing pharmacy entities such as Striker and Casa for his own financial gain. Further, on information and belief Defendant used and/or disclosed Revive's confidential information by improperly providing Morph with unauthorized preferential pricing that cost Revive millions of dollars. On information and belief, Defendant has also used and/or disclosed confidential information pertaining to Revive customers and prospective customers to market and ultimately divert business to competing entities thereby enriching himself.

115.    As a result of Defendant's breaches of the Employment Agreement, Revive has been injured.

116.    Revive, therefore, is entitled to actual and compensatory damages, attorneys' fees, costs, and such other further relief as the Court deems fair, just, and equitable.

117.    In addition, Revive is entitled to an injunction prohibiting Defendant from his ongoing breaches of the Employment Agreement and from improperly using and/or disclosing Revive's Confidential Information.

## COUNT VI
### Violation of the Defend Trade Secrets Act

118.    Plaintiff Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

119.    Plaintiff's Confidential Information described above and throughout constitutes "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." The Confidential Information constitutes Revive's "Trade Secrets" as defined in the Defend Trade Secrets Act. See 18 U.S.C. § 1839(3),

(4). For purposes of Counts VI and VII, Revive's trade secrets-at-issue shall be referred to as "**Confidential Information**."

120.    Revive owns the Confidential Information; it is the entity in which the rightful legal and equitable titles to and rights in the Confidential Information are reposed. Revive's Confidential Information is not readily ascertainable, through proper means, by an individual such as Defendant.

121.    To protect its Confidential Information, Revive utilizes password protected systems and other electronic security measures that restrict access from unauthorized individuals. To further protect its Confidential Information, Revive require agents such as Defendant to execute agreements containing confidentiality and non-disclosure provisions in order to work for Revive. In addition, to protect its Confidential Information, Revive restricts access to same through the use of electronic account security measures such as unique user identification and passwords. A Revive employee such as Defendant, for example, would be required to input a unique user ID and password to access electronic systems housing Revive's Confidential Information. Revive therefore took reasonable measures to preserve the confidentiality of the Confidential Information that was disclosed or otherwise made available to Defendant in his capacity as an employee of Revive. *See* 18 U.S.C. § 1839(3) .

122.    Defendant had access to Revive's Confidential Information. For example, Defendant had extensive contacts with Revive's customers, employees, contractors, and vendors; and had computer equipment provided by Revive that provided him with access to Revive's Confidential Information. Revive permitted Defendant to have access to its Confidential Information for the limited and exclusive purpose of servicing its customers in his capacity as a

Revive employee. Revive's Confidential Information was not and is not publicly known or accessible.

123.     Revive's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Confidential Information. Defendant derived economic value from the improper acquisition, disclosure and/or use of Revive's Confidential Information to obtain a commercial advantage and to compete with Revive by soliciting its customers. More specifically, and without limitation, Defendant used Revive's Confidential Information to solicit business from and of Revive's customers. In addition, on information and belief, Defendant is still using Revive's Confidential Information to benefit himself, and he will continue to do so if not stopped.

124.     Defendant owed Revive a duty to maintain the secrecy of the Confidential Information and to limit its disclosure. Defendant acquired knowledge of the Confidential Information in his capacity as an employee of Revive. Further, upon information and belief, Defendant acquired, disclosed, and used the Confidential Information by and through improper means. In addition, Defendant disclosed or used the Confidential Information without Revive's express or implied consent, insofar as Defendant used improper means to acquire the Confidential Information for the purpose of diverting business of and from Revive's customers away from Revive's and to a competitor. Defendant therefore "misappropriated" Revive's Confidential Information and Trade Secrets as defined in 18 U.S.C. Section 1839(5)(A) and/or (B).

125.     Defendant's misappropriation of the Confidential Information caused Revive to suffer actual losses, including but not limited to lost revenue from diverted customers, as Defendant disclosed or used the Confidential Information to benefit himself and competitors.

Defendant's conduct caused Revive, at a minimum, to lose business contracts, opportunities, or income; damaged and interfered with Revive's business goodwill, contracts, and relationships; allowed Defendant to obtain an unfair advantage in competing with Revive; and subjected Revive to unfair competition in the marketplace. Revive seeks compensation for their damages in the amount of all such actual losses. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(I).

126.    Revive also seeks damages for unjust enrichment caused by Defendant's misappropriation for amounts that are not addressed in computing the damages for actual losses; and additional damages measured by the imposition of liability for a reasonable royalty for Defendant's unauthorized disclosure or use of the Confidential Information. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II), (ii).

127.    Defendant also willfully and maliciously misappropriated the Confidential Information. Revive therefore seeks an award of exemplary damages in an amount of two times the amount of damages awarded as described in the foregoing paragraph, together with reasonable attorney's fees. *See* 18 U.S.C. § 1836(b)(3)(C) and (D).

128.    Revive also seeks an injunction to prevent any actual or threatened misappropriation, on such terms as the Court deems reasonable, requiring affirmative actions to be taken to protect the Confidential Information; and that the Court order payment of a reasonable royalty for future use of the Confidential Information. *See* 18 U.S.C. § 1836(b)(3)(A)(i), (ii), (iii).

### COUNT VII
### Violation of the Texas Uniform Trade Secrets Act

129.    Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

130.    Revive's Confidential Information described above and throughout constitutes trade secrets under Texas law.

SMRH:4926-2981-3040.3

-32-

131.    Revive owns the Confidential Information; it is the entity in which the rightful legal and equitable titles to and rights in the Confidential Information are reposed. Revive's Confidential Information is not readily ascertainable, through proper means, by an individual such as Defendant.

132.    As set forth above, Revive's Confidential Information has been compiled and/or developed by Revive over many years and at great expense to Revive. The Confidential Information is kept confidential and safeguarded by Revive and is not readily ascertainable and/or cannot be obtained readily and by proper means by third parties from outside sources. To protect its Confidential Information, Revive utilizes password protected systems and other electronic security measures that restrict access from unauthorized individuals. To further protect its Confidential Information, Revive require employees such as Defendant to execute agreements containing confidentiality and non-disclosure provisions in order to work for Revive. In addition, to protect its Confidential Information, Revive restricts access to same through the use of electronic account security measures such as unique user identification and passwords. An employee of Revive such as Defendant, for example, would be required to input a unique user ID and password to access electronic systems housing Revive's Confidential Information. Revive therefore took reasonable measures to preserve the confidentiality of the Confidential Information that was disclosed or otherwise made available to Defendant in his capacity as an employee of Revive.

133.    As described above, Defendant had access to Revive's Confidential Information. Revive permitted Defendant to have access to its Confidential Information for the limited and exclusive purpose of developing business and servicing customers in his capacity as a Revive employee under the protections of Texas law and the Employment Agreement, which expressly prohibits Defendant from using or disclosing any of Revive's Confidential Information for any

purpose inconsistent with the Employment Agreement, and Defendant's role and duties as an employee of Revive. Defendant therefore owed, and continues to owe, Revive a duty to maintain the secrecy of such information.

134.    Revive's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Confidential Information.

135.    Defendant derived economic value from the improper acquisition, disclosure and/or use of Revive's Confidential Information to obtain a commercial advantage and to compete with Revive by soliciting vendors, business partners, and customers. In addition, on information and belief, Defendant is still using Revive's Confidential Information to benefit himself, and he will continue to do so if not stopped. When Defendant took, utilized, and distributed Revive's Confidential Information, he did so in breach of its legal duties to Revive, and in violation of Texas law.

136.    For these reasons, Defendant has violated and continues to violate the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Section 134(A).001 et seq. Defendant's prior, current, and continued/threatened unlawful misappropriation of Revive's Confidential Information is wrongful, and the utilization of such information entitles Revive to both monetary damages and injunctive relief.

137.    Defendant's willful, malicious, and unlawful disclosure and use of Revive's Confidential Information has directly and proximately caused, and continues to directly and proximately cause, substantial and irreparable harm to Revive, for which there is no adequate remedy at law. Defendant have been unjustly enriched as a result of his wrongful conduct.

138.    Revive has and/or will be damaged by Defendant's misappropriation of its Confidential Information and has suffered actual, incidental, and consequential damages and injury that cannot be measured by any certain pecuniary standard. Because Defendant's misappropriation of Revive's Confidential Information is and was willful and malicious, Revive is also entitled to exemplary damages in addition to all actual damages and equitable relief. Revive is further entitled to recover its reasonable and necessary attorneys' fees. Tex. Civ. Prac. & Rem. Code 134A.005. Revive also seeks to recover pre-and-post judgment interest and court costs from Defendant.

139.    As set forth below in its Application for Preliminary Injunction, Revive also seeks an injunction to prevent any actual or threatened misappropriation, on such terms as the Court deems reasonable, requiring affirmative actions to be taken to protect the Confidential Information; and that the Court order payment of a reasonable royalty for future use of the Confidential Information.

## COUNT VIII
## Unjust Enrichment

140.    Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

141.    Defendant's actions described above and resulted in his own unjust enrichment.

142.    Revive conferred substantial benefits upon Defendant during his employment including, without limitation, salary, commissions, and other benefits (the "Compensation"). The Compensation was provided in consideration for Defendant's supposedly faithful service and adherence to his contractual and fiduciary obligations to Revive. During the period of Defendant's misconduct, Revive paid Defendant his full compensation and benefits while he secretly operated and benefitted from a competing enterprise, diverted business from Revive, and otherwise systematically undermined Revive's operations.

143.    During the entire period of his misconduct, Defendant wrongfully retained the Compensation while simultaneously breaching his obligations to Revive. During this period, Defendant received approximately $1 million in salary and commission payments from Revive. This Compensation was obtained through and as a result of Defendant's deliberate concealment of his competing activities.

144.    Defendant's retention of the Compensation would be unconscionable given his calculated scheme to compete with Revive while continuing to collect compensation and benefits as a Revive employee. Defendant leveraged his position of trust to operate in competition with Revive while simultaneously accepting payment from Revive—effectively requiring Revive to fund the establishment and operation of his competing activities. Hoelscher's double-dealing was particularly egregious given the nature of his job duties, responsibilities, and status with Revive.

145.    Principles of equity and good conscience demand that Defendant not be permitted to retain the benefits and Compensation conferred by Revive while he was actively undermining Revive's interests.

146.    Principles of equity also require disgorgement of all benefits and payments Defendant received while breaching his obligations to Revive. This includes, at minimum, all compensation paid during Defendant's period of disloyalty.

147.    Consequently, Revive is entitled to recover from Defendant the value of all benefits conferred during his period of disloyalty including salary, commissions, bonuses, other compensation, plus prejudgment interest on all such amounts.

**COUNT IX**
**Breach of Fiduciary Duty**

148.    Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

149.    Under Texas law, employees, including at-will employees, owe fiduciary duties to their employer. Among other duties, employees are obligated: (i) not to solicit their employer's customers and (ii) to act primarily for the benefit of their employer in matters connected to the employment.

150.    As a high-ranking and highly-paid Revive employee, Defendant owed Revive various fiduciary duties. These duties included:

(a) The duty not to solicit Revive customers;

(b) The duty of utmost good faith and fair dealing;

(c) The duty of loyalty;

(d) The duty of candor;

(e) The duty to refrain from self-dealing;

(f) The duty not to usurp or divert corporate opportunities;

(g) The duty not to misuse or improperly disclose Revive's confidential and proprietary information and trade secrets; and

(h) The duty to act primarily for the benefit of Revive in matter of his employment.

151.    Defendant breached his fiduciary duties. As described in more detail above, Defendant solicited customers and business opportunities away from Revive and to competitors in order to unjustly enrich himself. In addition, Defendant improperly and unilaterally provided significant and improper discounts on Revive products to Morph and Dr. Lawrence, resulting in millions in lost revenue. On information and belief, such discounts were provided in furtherance of and incentive for Defendant's ability to participate with Morph and Dr. Lawrence in a competing side business whereby Defendant received commissions on compound pharmacy prescription products filled by competing pharmacies for patients affiliated with Morph and/or Dr. Lawrence's

other clinics/businesses. As a result of the inappropriate, secret, and unilateral discounts Defendant provided Morph and Dr. Lawrence, Revive was deprived of millions of dollars in revenue which would it would have otherwise received had Morph and Dr. Lawrence paid appropriate and necessary pricing for Revive products.

152.    Defendant also engaged in a scheme of self-dealing to secure additional commissions and other payments for himself by way of diverting business from Revive and to competitors. Defendant acted in bad faith to further his own financial interests ahead of those of Revive, and in contravention of his fiduciary obligations to Revive.

153.    As described in more detail above, Defendant also breached his fiduciary duties by using and/or disclosing Revive's Confidential Information for the benefit of himself and others—specifically not Revive.

154.    Defendant's breach of his fiduciary duties to Revive harmed Revive and continues to harm Revive, including by diverting customer business, interfering with and jeopardizing client, vendor, and partner relationships, and harming Revive's customer and business goodwill.

155.    Revive is therefore entitled to damages, including punitive damages, from Defendant as well as all other available remedies.

### COUNT X
### Civil Conspiracy

156.    Revive repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

157.    Defendant conspired with others including, without limitation Paul, to undertake the various unlawful acts described above. These unlawful actions included: (i) breaches of the Employment Agreement through unlawful and unfair competition described above; (ii) improper

solicitation and diversion of business in violation of the Employment Agreement; (iii) actions resulting in the breaches of Defendant's fiduciary duties owed to Revive.

158.    Defendant and others, including Paul, had a meeting of the minds on the object of their conspiracy.

159.    Defendant committed an overt, unlawful act in furtherance of the object of the conspiracy.

160.    As a direct and proximate result of Defendant's actions in furtherance of the conspiracy, Revive has suffered damages and are liable for the underlying tortious conduct.

### APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF[17]

161.    Plaintiff formally requests a hearing on its request for preliminary injunctive relief after the conclusion of expedited discovery[18] and hereby moves for a preliminary injunction to prohibit Defendant from:

> (i) Working with or providing services to any competitor of Revive RX (including, without limitation, Striker, Casa, TTR, GLPN, RXR, or Morph) or otherwise engaging in any activity violates the non-competition covenant of the Employment Agreement anywhere in the United States.

> (ii) Directly or indirectly soliciting any clients, customers, vendors, contractors, suppliers or partners of Revive in any manner that would violate the Employment Agreement's non-solicitation covenant.

> (iii) Using or disclosing any of Revive's confidential and proprietary information or trade secrets in a manner that would violate Defendant's confidentiality obligations under the Employment Agreement and Texas law.

---

[17] Revive's application, like its Complaint, is supported by the Schneider Dec. and the Exhibit thereto. Revive has moved, or will immediately hereafter move, for expedited discovery in order to adequately prepare for a hearing on its application for a Preliminary Injunction. Revive reserves all rights to file all such further motions in support of its application for preliminary injunctive relief after securing additional necessary and expedited discovery in advance of the hearing.

[18] Which Plaintiff is separately requesting via a motion and brief in support of same.

A.    **Legal Standard.**

162.    "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Ryan LLC v. Fed. Trade Comm'n*, 739 F. Supp. 3d 496, 508 (N.D. Tex. 2024) (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood it will prevail on the merits, (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *See Harris Cnty. v. CarMax Auto Superstores, Inc*., 177 F.3d 306, 312 (5th Cir.1999). The decision to grant or deny a preliminary injunction is left to the sound discretion of the district court. *Ass'n of Taxicab Operators, USA v. City of Dallas,* 760 F. Supp. 2d 693, 696 (N.D. Tex. 2010).

163.    Importantly, demonstrating a "substantial" likelihood of success on the merits does not mean showing a claim is "certain" to succeed. *Byrne v. Roemer*, 847 F.2d 1130, 1133 (5th Cir. 1988) (explaining that "the movant need not always show a probability of success on the merits") (quoting *Celestine v. Butler*, 823 F.2d 74, 77 (5th Cir. 1987)); *see Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017) ("Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements."); *see Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co*., 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.").

164.    Here, as demonstrated in the Complaint and this application,[19] Revive has more than met its burden. Revive is substantially likely to succeed on its causes of action against Defendant in its breach of contract claims for violation of the Employment Agreement's restrictive covenants, which support an award of injunctive relief pending a trial on the merits, as well as in its claims for misappropriation of trade secrets and disclosure of confidential information.

**B.    Revive Has A Substantial Right To Relief.**

    **a.    Revive has a substantial right to relief on its contract claims arising from the Employment Agreement's restrictive covenants.**

165.    The Texas legislature has provided a clear test for determining whether non-competition and non-solicitation restrictions are enforceable.   The Texas Covenants Not to Compete Act (the "**Act**") states, in relevant part:

> A covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill of other business interest of the promise . . .

Tex. Bus. & Com. Code § 15.51(c).

166.    Defendant executed an enforceable Employment Agreement that contains reasonable and enforceable restrictive designed to protect the goodwill and other business interests of Revive. In exchange, Revive provided Eckert with substantial monetary compensation[20]  and access to Revive's confidential and proprietary information and cherished vendor, partner, and customer relationships. In return, Defendant promised not to disclose that information and to adhere to reasonable one-year non-competition and non-solicitation covenants.

---

[19] Both of which are supported by the Schneider Dec.

[20] Nearly $1 million in salary and commission payments.

167.    As mutual, non-illusory promises, where the employer provided the employee with confidential information and the employee agrees not to disclose that information, the Employment Agreement is an otherwise enforceable agreement that existed at the time the parties entered into the restrictive covenants. *Alex Sheshunoff of J Mgmt. Services, L.P. v. Johnson*, 209 S.W.3d 644, 657 (Tex. 2006).

168.    The Employment Agreement's restrictive covenants are ancillary to or part of an otherwise enforceable because the consideration provided by Revive gives rise to Revive's legitimate interests in restraining Defendant from competing; and the restrictive covenants were designed to enforce Defendant's consideration or return promise in the otherwise enforceable Employment Agreement. *Sheshunoff*, 209 S.W.3d at 648, 649 (Tex. 2006); *Ireland v. Franklin*, 950 S.W.2d 155, 158 (Tex. App.—San Antonio 1997, no writ).

169.    The Employment Agreement's non-competition and non-solicitation covenants ("**Restrictive Covenants**") contain post-employment restraints that are reasonable and do not impose a greater restraint than necessary to protect Revive's confidential information, legitimate business interests, and goodwill.

170.    The Restrictive Covenants are one-year restrictions which are reasonable under Texas law. *See, e.g., Sheshunoff*, 209 S.W.3d at 657 (upholding one- year restraint on providing consulting services); *Inv. Diversified Serv., Inc. v. McElroy*, 645 S.W.2d 338, 339 (Tex. App.—Corpus Christi–Edinburg 1982, no writ) ("The one-year restraint involved here is certainly reasonable, as two to five years have repeatedly been held to be reasonable."). Furthermore, the one-year limitation is reasonable to allow Defendant's knowledge of Revive's confidential and proprietary information, vendor, customer, and partner information, pricing and other proprietary

information to grow stale and to reduce the impact that disclosure of such information would have on Revive.

171.    Additionally, the one-year time period provides Revive with a reasonable opportunity to maintain customer, business, vendor, and partner relationships unmolested by unlawful or unfair competition. The nationwide scope of the Employment Agreement's non-compete is reasonable because of the nationwide nature of Revive's business. *See Vais Arms Inc. v. Vais*, 383 F.3d 287, 296 n.20 (5th Cir. 2004) ("Texas courts have upheld nationwide geographic limitations in non-compete agreements when it has been clearly established that the business is national in character.").The nationwide nature of the non-compete is also reasonable because Defendant conducted business for Revive on a nationwide scale and held a high-level role as Revive's Sales Director. *TransPerfect Translations, Inc. v. Leslie*, 594 F.Supp.2d 742, 754 (S.D. Tex. 2009) (citation omitted)( "[a] reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer.); *Daily Instr. Corp. v. Heidt*, 998 F.Supp.2d 553, 567 (S.D. Tex. 2014) (noting that Texas courts uphold covenants with wide geographic areas where the area covered constitutes the actual work territory for the former employee); *Gehrke v. Merritt Hawkins & Assocs., LLC*, No. 05-18-01160-CV, 2020 WL 400175, at *4 (Tex. App.-Dallas Jan. 23, 2020, pet. denied) ("[B]road geographic restrictions have been upheld when the area constitutes the employee's actual work territory or when the employee held a management or executive position with the employer") (citing cases).

172.    The scope of activity restraint in the Employment Agreement's non-compete is reasonable. Specifically, during his employment and for one year thereafter, Defendant is prohibited from providing services to competitors—*i.e.*, "any person that provides a product or service" that Revive also provides. Thus, the Employment Agreement prohibits Defendant from

providing competing services to a competing entity—this is the epitome of reasonableness. *E.g.,* *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 652 (Tex. App.-Houston [1st Dist.] 2009, pet. denied) (restraints tied to employee's work at the prior employer are reasonable).

173.    The scope of the Employment Agreement's non-solicitation covenant is reasonable because courts have found such restraints reasonable *even where* the provision prevents the former employee from soliciting customers with whom they had no direct contact. *Gehrke*, 2020 WL 400175, at *3 (holding that non-solicitation provision prohibiting employee from soliciting customers with whom he had no dealings during his employment was permitted where employer's "business interests involved not only preserving its client base but also maintaining confidential information and trade secrets"); *Accruent, LLC v. Short*, No. 17-cv-858, 2018 WL 297614, at *6 (W.D. Tex. Jan. 4, 2018) (holding under Texas law that a non-solicitation provision preventing an employee from soliciting customers with whom he had no personal involvement was reasonable because the employer's business interests included not only the employee's client base but also the employee's knowledge of proprietary information, which he might use to help a competitor); *see also Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *12 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied); *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 798-800 (S.D. Tex. 2010).

174.    Here, the Employment Agreement's non-solicitation covenant restricts Defendant from:

> Solicit[ing] or encourag[ing] any client, customer, prospective customer, vendor, contractor, supplier or other business partner of the Company to terminate or diminish its relationship with the Company; or seek to persuade any such client, customer, vendor, supplier, or other business partner, or any prospective client, customer, vendor, supplier or other business partner of the Company to conduct business with anyone other than the Company with respect to any business or activity then conducted by the Company or that could reasonably be expected to be conducted by the Company[.]

175.    Importantly, the persons covered by this restraint include only those who were clients, customers, vendors, suppliers, or partners of Revive within the preceding two (2) years or whom the Company had solicited in the preceding two years.

176.    This is eminently reasonable because the restraint is tied to the vast amounts of confidential information and customer/vendor/partner contact information and relationships Defendant acquired and had perpetual access to in his role as Sales Director.

177.    Finally, the scope of activity restraint in the Employment Agreement is reasonable. On information and belief Defendant is performing the same services for himself and the other competing entities listed above as he was for Revive—and was doing so during his Revive employment. Consequently, the practical reality is that Defendant has been—and is now— providing products and services in direct competition with and to Revive. Specifically, and among other things, Defendant has been, and is, causing prescriptions from actual or potential Revive customers to be filled by competing pharmacy entities in order to benefit himself at Revive's expense. Accordingly, Defendant's activities fall squarely within the 'bulls' eye' of the Employment Agreement's restrictive covenants.

**b.    Revive has a probable right to relief on its non-contract claims.**

178.    Revive is also substantially likely to succeed on its other non-contract claims including breach of fiduciary duty, unjust enrichment, breach of confidentiality obligations, and misappropriation of trade secrets (both under TUTSA and the federal DTSA). These claims also support an award of injunctive relief.

179.    Under Texas law, current employees owe fiduciary duties to their employer. This duty includes obligations such as not soliciting the company's customers while still employed or usurping the employer's business opportunities. Opportunities. *Centennial Bank v. Holmes*, 717

F. Supp. 3d 542, 571 (N.D. Tex. 2024) (citing cases). The duty not to act adversely to the employer's interests persists during the period of employment. For example, an employee may not run a competing business while still drawing a salary from their employer. See, e.g., Salas v. Total Air Servs., LLC, 550 S.W.3d 683, 694-95 (Tex.App.—El Paso 2018, no pet.) (finding that "conducting a competing business in the same market and at times soliciting the very same customers that his employer was pursuing" breached employee's fiduciary duties owed to employer).

180.    Here, Defendant—as Revive's Sales Director—owed fiduciary duties to Revive, his employer. These duties included obligations not to: (1) solicit or attempt to solicit away Revive customers and prospects; (2) usurp corporate opportunities of Revive; or (3) engage in adverse, competitive acts while still drawing a salary from Revive. As described above, Defendant did just that—while still employed by Revive.

181.    Defendant's actions constitute breaches of his fiduciary duties owed to Revive and resulted in his unjustly enriching himself at Revive's expense. As a result, Revive has suffered lost or diverted business and been deprived in the value of its substantial investments in marketing, business, and customer relationships, as well as the value of the compensation paid to Defendant in exchange for his services—services which should have been performed exclusively for and on behalf of Revive.

182.    In addition, Revive is likely to prevail on its claims for misappropriation of trade secrets and breach of contractual confidentiality obligations. Revive's customer information, vendor information, business partner information, pricing data, and marketing strategies constitute protected trade secrets and, in addition, comprise the company's confidential information. *See* 18 U.S.C. 1839(3) (defining a "trade secret" to include "all forms and types of financial, business,

scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing"). This information is not generally known to the public and Revive took reasonable measures to maintain its secrecy through technical safeguards and confidentiality measures. When executing his Employment Agreement, Defendant acknowledged: (i) that Revive possesses confidential information and trade secrets; (ii) that he would be provided with same as part of his Revive employment; (iii) that he was obligated not to use or disclose Revive's confidential information and trade secrets for any purpose outside of his Revive employment; and (iv) that the Restrictive Covenants were a necessary measure to protect Revive's confidential information and trade secrets, among other legitimate business interests.

183.    Despite his legal and contractual obligations, Defendant misappropriated Revive's trade secrets and confidential information through improper acquisition and unauthorized use, as Defendant only acquired Revive's confidential information and trade secrets as a result of his Revive employment and had a duty to limit their use and maintain their secrecy. *E.g.,* Tex. Civ. Prac. & Rem. Code. Ann. § 134A.002(3)(B)(ii)(b) ((explaining misappropriation can occur where the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret); 18 U.S.C. § 1839 (same).

184.    As explained in detail above and throughout, Hoelscher used Revive's trade secrets and confidential information for his own personal gain and to Revive's detriment by—among other things—operating and working on behalf of competing entities both during his Revive employment and the Employment Agreement's Restricted Period. By doing so, Defendant

unlawfully enriched himself at Revive's expense. thereby enriching himself at Revive's expense. This is the epitome of misappropriation.

C.    **Revive Will Suffer Probable, Imminent, And Irreparable Injury Absent Injunctive Relief.**

185.    Defendant is already breaching the Employment Agreement's Restrictive Covenants and violating fiduciary and other legal duties owed to Revive while unlawfully enriching himself. On information and belief, Defendant began providing competitive services for others in order to enrich himself—and at Revive's expense—during his Revive employment and continues to do so. Indeed, on information and belief Defendant formed and/or operated a web of interconnected entities discussed above whose sole purpose was to drive prescription pharmacy business elsewhere so that Defendant (and these side entities) could profit.

186.    The resulting harm to Revive will be irreparable. Texas courts have repeatedly held that injury from an employee's breach of restrictive covenants is the "epitome of irreparable harm". *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349 (N.D. Tex. 1991) (mem. op.).

187.    That is precisely what has occurred—and what will continue to occur if Defendant is not enjoined. Defendant should not be permitted to continue to profit himself through unlawful actions. Accordingly, the Court should enter an injunction order that requires Defendant to live up to his fundamental contractual and legal obligations.

D.    **Revive's Risk Of Injury Outweighs Any Potential Harm To Defendant.**

188.    Far greater injury will be inflicted on Revive by the denial of injunctive relief than will be suffered by Hoelscher if such relief is granted.

189.    Revive seeks nothing more than an injunction requiring Hoelscher to live up to his contractual and legal obligations—including his obligations not to breach his Employment

Agreement and misappropriate Revive's confidential information and trade secrets. At this time, Revive is still working to fully grasp the extent of its losses resulting from Defendant's contractual breaches and misappropriation. But if left unchecked, Defendant's wrongful conduct will result in Revive facing a significant risk of losing customer relationships, market share, goodwill, and the value of its confidential information and trade secrets. All of which has taken Revive years—and substantial expense—to develop and cultivate.

E.    <u>**Issuing An Injunction Will Not Adversely Impact The Public Interest.**</u>

190.    The public interest will be served by the Court issuing an injunction in this case. In short, "it is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law." *Keurig Dr.* Pepper *Inc. v. Chenier*, No. 4:19-cv-505, 2019 WL 3958154, at *10 (E.D. Tex. Aug. 22, 2019). Allowing Defendant to evade his contractual and legal obligations would undermine the public's trust in the sanctity of enforceable contracts and the force of law. Accordingly, the public interest counsels an injunction.

**REQUEST FOR HEARING ON EXPEDITED DISCOVERY**
<u>**TO PREPARE FOR PRELIMINARY INJUNCTION HEARING**</u>

191.    Revive respectfully requests the Court set a hearing on its forthcoming motion for expedited discovery at the earliest possible time and, after considering the request, grant Plaintiff's request for expedited discovery in order to allow Plaintiff to prepare for a hearing on its application for a Preliminary Injunction.

192.    Upon the conclusion of expedited discovery, Plaintiff respectfully requests the Court set its application for a preliminary injunction for hearing and, after hearing, issue a preliminary injunction against Defendant.

## REQUEST FOR PERMANENT INJUNCTION

193.    Revive asks the Court to set its request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendant.

## CONDITIONS PRECEDENT

194.    Any and all conditions precedent to Revive's claims for relief have occurred, been performed, fully satisfied, and/or waived.

## ATTORNEYS' FEES

195.    Based on the acts and/or omissions of Defendant described above, Revive has retained the services of Sheppard Mullin Richter & Hampton LLP to protect its interests and pursue the foregoing claims. Revive is therefore entitled, pursuant to Texas Civil Practice & Remedies Code § 38.001, and all other applicable Texas laws, to recover from the Defendant its attorneys' fees and costs incurred in connection with this dispute and in pursuing its claims. All conditions precedent to Revive's recovery of attorneys' fees have been fulfilled by Revive or have been waived as a result of Defendant's acts or omissions.

## PRAYER FOR RELIEF

Revive seeks judgment in its favor and an order against Defendant that grants the following relief:

    i    Damages in an amount to be proven at trial;

    ii    Statutory damages, including multipliers and equitable enhancements as may be permitted by law;

    iii    Exemplary and punitive damages for Defendant's willful and malicious conduct;

    iv    Disgorgement of all ill-gotten gains by Defendant, as permitted by law;

   v   Injunctive relief in the form described above and herein that enjoins Defendant from performing any work or other duties in any capacity that violate the Restrictive Covenants in his Employment Agreement—specifically the non-compete and customer non-solicitation covenants. Defendant should also be enjoined from using or disclosing any of Revive's confidential and proprietary information or trade secrets in violation of the confidentiality obligations in his Employment Agreement and TUTSA;

   vi  Pre-judgment and post-judgment and all other interest on any and all monetary damages, as permitted by law;

   vii  Attorneys' fees and costs, as permitted by law;; and

   viii Any and all such further relief the Court deems just and proper.

Dated: April 2, 2025

Respectfully submitted,

By: _____*/s/ Stephen E. Fox*_____

Stephen E. Fox
Texas Bar No. 07337260
sfox@sheppardmullin.com
Jonathan Clark
Texas Bar No. 24069515
jclark@sheppardmullin.com
Alexandria Amerine
Texas Bar No. 24132154
aamerine@sheppardmullin.com
Graydon Cowan
Texas Bar No 24142806
gcowan@sheppardmullin.com

Sheppard, Mullin, Richter & Hampton LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone: 469-391-7400
Facsimile:  469-391-7401

**ATTORNEYS FOR PLAINTIFF**